### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

DELORES J. BAILEY,

                        **Plaintiff,**

-vs-                                        **Case No.  6:11-cv-1255-Orl-31DAB**

COMMISSIONER OF SOCIAL
SECURITY,

                        **Defendant.**
_____

# Memorandum Opinion & Order

The  Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED.**

## I.      BACKGROUND

### A.      Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits in June and July 2008, alleging an onset of disability on September 30, 2007, due to right eye blindness, vision field/efficiency loss, and glaucoma like pressure in both eyes; schizophrenic/paranoid, affective/mood, or other psychotic disorders, emotional problems, and migraines. R. 46-48, 173.  Her application was denied initially

and upon reconsideration.  R. 51-57, 62-65.  Plaintiff requested a hearing, which was held on May

25, 2010, before Administrative Law Judge Gerald F. Murray (hereinafter referred to as "ALJ").  R.

24-45.  In a decision dated June 14, 2010, the ALJ found Plaintiff not disabled as defined under the

Act through the date of his decision.  R. 7-22.  Plaintiff timely filed a Request for Review of the

ALJ's decision, which the Appeals Council denied on May 24, 2011.  R. 1-6.  Plaintiff filed this

action for judicial review on July 29, 2011.  Doc. No. 1.

### B.    Medical History and Findings Summary

At the time of the alleged onset date of disability, September 30, 2007, Plaintiff was

twenty-three years of age, and had completed two years of college. R. 133, 156. Prior to the alleged

onset date of disability, she had been employed as an office worker (R. 153), which the vocational

expert characterized as light work. R. 35.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary,

Plaintiff complained of right eye blindness, vision loss in her left eye, and glaucoma-like pressure in

both eyes, affective/mood, or other psychotic disorders, difficulties focusing or dealing with people,

and migraines.  R. 46-48, 152, 173, 193.   After reviewing Plaintiff's medical records and Plaintiff's

testimony, the ALJ found that Plaintiff suffered from blindness in her right eye and depression, which

were "severe" medically determinable impairments, but were not impairments severe enough to meet

or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 12-

13. The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform the

full range of work at all exertional levels but with nonexertional limitations including being limited

to unskilled work due to depression, which has reduced her concentration, persistence and pace.  R.

13.  Based upon Plaintiff's RFC, the ALJ determined that she could perform her past relevant work

as an office helper because the work did not require the performance of work related activities

precluded by her RFC.  R. 16.  Accordingly, the ALJ determined that Plaintiff was not under a

disability, as defined in the Act, at any time through the date of the decision.  R. 17.

Plaintiff now asserts three points of error.  First, she argues that the ALJ in determining that she had the RFC to perform a full range of work at all exertional levels, although "limited to unskilled work due to depression which has reduced her concentration, persistence and pace," by failing to consider all the medical evidence and the opinions from the treating and examining physicians, particularly with regard to her vision problems.  Second, she claims the ALJ erroneously indicated that the VE testified she was capable of performing her past relevant work, even though the VE never offered that testimony.  Third, Plaintiff contends the ALJ erred by finding she was "not credible" when the record clearly reveals that the Plaintiff suffered from documented impairments causing significant limitations; and the ALJ inconsistently noted that she did not testify when she, in fact, did testify.  Although the Commissioner concedes two of the challenged errors committed by the ALJ, he argues such errors were harmless and that the ALJ's decision should be affirmed.  For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## II.      STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir.

2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

## III.    ISSUES AND ANALYSIS

### A.    Impairments, RFC and the physicians' opinions.

Plaintiff argues that the medical evidence reflected her disabling vision problems, which the ALJ ignored and failed to adequately analyze. Plaintiff claims that the ALJ should not have found her able to perform her past relevant work in light of limitations from her vision impairments, as noted by several ophthalmologists. The Commissioner argues that Plaintiff failed to prove she could not return to her past relevant work, or that she was as limited as she claimed from her symptoms.

At Step 2 of the five-step evaluation process, the ALJ is called upon to determine whether a claimant's impairments are severe.  By definition, this inquiry is a "threshold" inquiry.  It allows only claims based on the most trivial impairments to be rejected.  In this Circuit, an impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.  A claimant need show only that her impairment is not so slight and its effect not so minimal.  *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments.  20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997).  The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof.  *Id.*  Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

There is no dispute that Plaintiff is blind in her right eye, and her right eyeball was eventually removed surgically.  The issue is whether the ALJ's findings regarding Plaintiff's visual acuity in her left eye, and limitations in her vision in general were erroneous.  Plaintiff argues that the ALJ erred in rejecting Dr. Vocci's December 29, 2008 opinion  that Plaintiff was legally blind in her left eye and

that she was disabled.  R. 14.  The Commissioner contends the decision on disability is a matter reserved to the ALJ and the ALJ's decision is supported by the opinion of the medical expert and the reviewing physicians.

Dr. Vocci was Plaintiff's treating ophthalmologist since her original eye injury in 2000 when she was injured during a failed high school chemistry experiment.  R. 329.  The ALJ rejected the opinion of Dr. Vocci as "contrary to that of Dr. Brewer who opined 20/40 vision in a normal left eye" and "contrary to the opinion of the ME who testified that a consulting physician filed an RFC report stating that there is a 40% error rate in testing due to false negatives and that the testing was not considered reliable by SSA" and because the "ME agreed with Dr. Brewer that her left eye was normal." R. 15.

Plaintiff argues that the ALJ erred in indicating that the opinion of Dr. Vocci was "contrary to that of Dr. Brewer" (*see* R. 15), when the "doctor" to whom the ALJ refers to as "Dr. Brewer" at Exhibit 5F (R. 265-272) is, in fact, Dr. Vocci.  A careful review of the records indicates that "W. Brewer" is merely the "Examiner" from Social Security Administration DDS at phone number 407-897-2970 ext. 1110.  R. 265.  The *case* "examiner" named W. Brewer allowed Dr. Mark Vocci to perform the visual field testing, and Dr. Vocci certified that he performed the test on August 22, 2008. R. 271.

Plaintiff argues that, in addition to the issue with the ALJ's erroneous description of the report actually authored by Dr. Vocci (and not the non-existent "Doctor" Brewer) characterized as "conflicting" with Dr. Vocci's others reports, Dr. Vocci's opinions from August and September of 2008 are *consistent* with his later December 2008 opinion; although it is true that Dr. Vocci noted that Plaintiff's best corrected vision was 20/40, that is not why he concluded Plaintiff was legally blind – rather it was because of a visual field defect in the left eye and the pale optic nerve. R. 271-72. Plaintiff argues that the ALJ completely ignored Dr. Vocci nine-year treatment of Plaintiff (since

2000) after she was injured in the high school chemistry lab accident and suffered trauma to the right eye and "head trauma in general." R. 329. Dr. Vocci noted that the examination in 2000 after the accident revealed "bullous keratopathy in the right eye" and the "left eye disclosed a pale optic nerve with a cup-to-disk ratio of 0.3," and the visual field test performed on the left eye done at that time revealed a "visual field less than 20 degrees." R. 329. He opined that Plaintiff's condition was from traumatic optic neuropathy left eye, with visual field defect; and resulting legal blindness, left eye, due to visual field defect, secondary to trauma. R. 329-30. Plaintiff argues that the visual field testing immediately after the accident noted a visual field less than 20 degrees is consistent with the visual field test that Dr. Vocci performed in 2008, and the ophthalmologists at the University of Florida noted that there was a visual field constriction of the left eye, which supports Dr. Vocci's opinion. R. 370.

Plaintiff also argues the ALJ erred in rejecting the opinion of Dr. Vocci as contrary to the medical expert's opinion who testified at the hearing. R. 15. Plaintiff argues that the ALJ should not have given the medical expert's opinion more weight than Dr. Vocci's, since the ME did not have an opportunity to review all of the medical evidence in this case, and was only provided certain pieces of evidence. R. 30. The ME informed the claimant's representative that he merely had the visual field tests from August 22 and September 5 or 2008, and the note from Dr. Vocci dated December 2008. R. 30-32. Plaintiff argues that the ME erroneously dismissed the conclusion of the treating physician who treated Plaintiff immediately after her eye injury because he found the term "traumatic optic neuropathy" to be "totally inconsistent" and "out of left field." R. 31. Plaintiff argues the ALJ should not have given more weight to the non-examining ME's opinion over that of her treating ophthalmologist because he never examined Plaintiff, especially right after the accident, as did her treating physician.

The Commissioner concedes that Dr. Vocci noted Plaintiff's optic nerve evaluations indicated Plaintiff's left eye visual fields were *abnormal* and "stable" (R. 314) but argues that Plaintiff had 20/40 vision in her left eye (R. 271) and "normal" findings during August-September 2008.  R. 310-13.  The Commissioner also contends that the two state agency physicians support the ALJ's opinion because they opined that, according to Dr. Vocci's testing, Plaintiff's vision problems did not meet a listing.  R. 294-98 334.  However, both of the state agency reviewing physicians noted that the testing also showed Plaintiff had limited visual acuity, depth perception, color vision and field of vision, and that Plaintiff had restarted treatment for glaucoma (after stopping years ago); the reviewing physicians noted Plaintiff had end stage glaucoma in the right eye and "possible optic neuropathy" in left eye.  R. 294, 334[1].  One reviewing physician noted the result of Goldman VF testing and the Visual Assessment Worksheet were that Plaintiff's left eye had visual field efficiency of 36.6%, and overall visual efficiency was 31.1%, not at listing level.  R. 334.  The second reviewing physician was more thorough, noting that by early October 2008, Plaintiff's visual acuity had decreased, to 20/60, and to  20/70 by late October; and "Dr. Vocci opines possible etiology for VF loss as due to prior trauma," but the brain and orbit results were not in the records the medical records the reviewing doctor had.  R. 334.  The reviewing doctor noted traumatic glaucoma in the right eye, and loss of vision in the left eye "not yet diagnosed," that Plaintiff's complaints were credible; and her pain in the right eye was treatable with medications versus enucleation (removal of the eyeball).  R. 336.  Plaintiff was experiencing pain below her right eyebrow and headaches on the right side, which led to her right eyeball apparently being removed.  R. 370-71.

Dr. Vocci examined Plaintiff in August 2008, noting her accident to her right eye in the accident at school in 2000 when a project blew up; she had had several surgeries since then, and her

---

[1]One of the reviewing doctors, Dr. Goodpasture, (like the ALJ) erroneously noted "Dr. Brewer's" consultative examination showed the left eye vision of 20/40, when Dr. Vocci had performed the testing.

eye had begun to hurt in the brow area; she had been told that she had blisters on the surface. R. 312. Dr. Vocci noted that Plaintiff was experiencing a visual field defect in her left eye, "probably traumatic"; he recommended a CT scan of her brain. R. 311. The visual field chart he completed showed two areas and handwritten notes indicated "abnormal – probable traumatic – but will prescribe glaucoma medication." R. 316.

Dr. Vocci eventually referred Plaintiff to the University of Florida Eye Physicians, where she was seen in January 2009 for diagnosis of her complaints of vision blurring in the left eye intermittently; her visual field test and peripheral visual acuity was decreasing; the intraocular pressure was increasing in the left eye. Plaintiff's visual acuity had been blurry in the left eye since the 2000 accident, but she had no pain in that eye. R. 368-70. By January 2009, she had difficulty reading with her left eye; her vision in the left eye was 20/60. R. 368. Plaintiff was diagnosed with visual field constriction in the left eye, and a "central island," which is a "major ablation defect where areas in the central cornea" – a "significant elevation will typically cause multiple images and loss of best-corrected visual acuity."[2] R. 369. The nerve did not appear glaucomatous, and there was no sign of macular disease or keratoconus; Plaintiff was accommodating[3] during retinoscopy. R. 368, 370. Dr. Johnson noted Plaintiff had been told she was legally blind (R. 368) by Dr. Vocci, and he opined based on her gradual decline in visual acuity since her surgery (which was 20/20 prior to the surgery) that she "may have early sympathetic ophthalmia."[4]

---

[2]See http://www.lasermyeye.org/patients/learning/centralislands html.

[3]Accommodation is the eye's ability to automatically change focus from seeing at one distance to seeing at another. See http://www.allaboutvision.com/resources/glossary htm (visited on August 23, 2012).

[4]See Sympathetic Ophthalmia is a rare condition that can occur, after one eye is injured, when inflammation threatens blindness in both eyes after varying periods of time. Thomas P. Ward, Sympathetic Ophthalmia, www.bordeninstitute.army.mil/ published_volumes/.../OPHch16.pdf (visited on August 23, 2012); see http://www ncbi nlm nih.gov/pubmed/16282154 (visited August 23, 2012).

Plaintiff was referred internally to the neuro-ophthalmology department at the University of Florida Eye Physicians. R. 370. The neuro-ophthalmology department record from January 2009 states that "enucleation pending right eye-will see Dr. Cessman," but the records from that surgery are not in the SSA Record, although mental health records from July 2009 report that the right eyeball had already been removed and her representative mentioned it at the hearing. R. 32, 367, 371.

The ophthalmologist and medical expert, Dr. Lawrence G. Reese ("ME") testified at the hearing on May 25, 2012 that he had reviewed the records from Dr. Vocci dated August 28, 2008 (testing), September 5, 2008 (Humphrey Field Analyzer), and December 29, 2008 (letter). R. 31. The ME testified that Dr. Vocci's December 29, 2008 notes where he indicated that Plaintiff had "traumatic optic neuropathy of her left eye with a visual defect made no sense whatsoever" to the ME because "the trauma was to the right eye. And then all of a sudden out of left field, they use the term traumatic optic neuropathy." R. 31.

"Where did that come from, there's no basis on that?" R. 31. "[W]hen you get Trauma to one eye, you can get a disease . . . sympathetic ophthalmia, but it doesn't affect the nerve the way an optic neuritis would effect the nerve. It affects the retina and gives . . . an inflammatory disease of the eye. So where is that traumatic optic neuropathy, I have no idea." R. 32. It is clear from the ME's testimony that he was unaware Plaintiff's right eye had been removed (until Plaintiff's representative mentioned it) and the ME referred to it as "basically a non-seeing eye." R. 28. He testified that the visual field efficiency on the testing was about 23% and was "getting close" and the total visual efficiency dropped below 20 percent, but he did not believe the results were valid because the false positives were 40%, which exceeded 33% – the guideline for accurate results on the visual field testing. R. 28[5]. The ME described Plaintiff's uncorrected vision as 20/50 or 20/60, but when refracted

---

[5]As the Commissioner points out, the ME stated that he had also reviewed medical records from January 2009, which were presumably from University of Florida Eye Physicians, but he did not specifically comment on the vision screening or results. R. 28.

20/30, which he described as "pretty good vision" for the left eye. R. 29. However, Dr. Vocci's December 29, 2008 letter stated that Plaintiff's vision in her left eye was 20/40 and it did *not improve with refraction*. R. 329. The distinction is important because, as the ME testified, most states will only allow a driver's license if vision is at least 20/40 in the one good eye, and when she was tested in 2009 by the University of Florida Eye Physicians, Plaintiff's vision had gotten worse (20/60 and 20/50 in January 2009), and she reported it had been blurring intermittently. R. 368-70.

The Commissioner contends that "doctors at the University of Florida could find no explanation for Plaintiff's reported reduced left eye vision because she had a "full visual field," (Doc. 19 at 13, citing R. 363-64); however, there are no records of the actual visual field testing (such as the Humphrey Field Analyzer - R. 267) like the under the lengthy guidelines given to Dr. Vocci – instead, there are handwritten notations from the University of Florida Eye Physicians in January 2009 which indicated "abnormal" confrontational visual fields (R. 370) and from February 2009 which indicated "slow CF in all quadrants." R. 365. Neither of the records indicated "normal" results or "full" visual field testing as the Commissioner argues.

In addition, there is no explanation of why the ME omitted any discussion of Dr. Vocci's opinion in the December 2008 letter that Plaintiff had a "pale optic nerve" with a cup-to-disk ratio of 0.3 – a separate condition – or Dr. Vocci's treatment of Plaintiff for glaucoma. R. 329. The ME did not even comment on those findings, and he did not address the opinions of the University of Florida Eye Physicians about the "abnormal" visual field testing. R. 26-35. Moreover, the ME was focused almost exclusively on the question of whether Plaintiff met the listing level of blindness[6] based on the visual field testing and did not comment on the optic nerve or glaucoma issues Dr. Vocci identified, in terms of giving the ALJ an opinion as to the limitations that would exist for impaired vision due to the conditions Dr. Vocci noted, even if the ME did not believe, in his opinion, that it met the listing

---

[6]"My opinion is that she does not meet the listings." R. 26.

level of severity.  The Commissioner concedes that "the  ALJ did not include any vision-related limitations" in the RFC finding.  Doc. 19 at 15.

The ALJ's erroneous interpretation of "Dr. Brewer's" results in conflict with Dr. Vocci's and, his reliance on the ME's narrowly focused opinion on the listing level, without consideration of any of the Plaintiff's additional vision or other limitations – particularly in this case when some records are clearly missing – was not based on substantial evidence.

Plaintiff also argues that the ALJ erred in failing to discuss all of the findings of the consultative examining psychologist, Dr. Delgado, who diagnosed Plaintiff with Psychotic Disorder, Rule Out Schizophrenia with a global assessment of functioning score of 44. R. 264.  On remand, the ALJ will address all of the findings in Dr. Delgado's report, consistent with the social security regulations.

**B.  Issues with the ALJ's description of the VE's testimony**

Plaintiff argues that the ALJ erred after indicating that the vocational expert testified that the claimant was capable of performing her past relevant work, but the vocational expert never offered that testimony.  The Commissioner concedes that the ALJ "accidentally mischaracterized" the VE's testimony but argues that, "given the substantial evidence in support of the ALJ's finding that Plaintiff could return to her office helper work," the error was harmless and not contrary to the ALJ's overall findings.  R. 34-36.

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant court perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"].

*Foote*, 67 F.3d at 1558.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  *Walter v. Bowen*, 826 F.2d 996, 1002-3 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  *Foote*, 67 F.3d at 1559.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.  *Foote*, 67 F.3d at 1559.

In this case, although the ALJ concluded that the claimant could perform her past relevant work as an office helper, he reached this conclusion without posing *any* hypothetical to the VE about an individual with Plaintiff's RFC.  R. 35.  Yet the ALJ's decision indicated the "vocational expert testified that based on her residual functional capacity, the claimant could perform her past relevant work as an office helper" and that the "vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles" (R. 16) though the ALJ never asked the VE about

this[7]. R. 35. Accordingly, the ALJ's determination that Plaintiff could perform her past relevant work was not based on substantial evidence.

### C.    Credibility

Plaintiff asserts that the ALJ erred in finding that she was "not credible" to the extent they exceeded the RFC he assigned, when he erroneously stated that Plaintiff had "not testified (R. 14)," even though she did. R. 35-43. Plaintiff also argues that the ALJ did not make accurate and specific findings as to credibility of the Plaintiff, which amount to a failure in developing a full and fair record. The Commissioner argues the error is harmless and the ALJ properly relied on the medical evidence in the record in making his decision.

Where an ALJ decides not to credit a claimant's testimony about limitations, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

The ALJ questioned Plaintiff's credibility during the hearing when he asked her whether she could drive (because he had seen that in the record) and Plaintiff responded that she could not drive okay. R. 39. "I heard him say that something about [false positives]. . . . I remember when I was doing the test that they were saying that it wasn't lining up with what I just saw. But I was trying to

---

[7]The Commissioner relies on the Dictionary of Occupational Titles' description of office helper to argue certain vision limitations would not impact Plaintiff's ability to perform this past relevant work, even though the ALJ did not even discuss it or ask the VE about it. The Commissioner cannot rely on findings that were not put forth by the ALJ and the Court is limited to evaluating the reasons provided by the ALJ in his decision. *See, e.g.*, *Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010) (citing *FPC v. Texaco Inc.*, 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974)).

explain to them that it changes all the time.  So when I don't – the reason why I don't drive is because sometimes I can see while we're riding along, and then all of a sudden, everything goes blurry.  Or I'll see something one second, and then, it really either wasn't there or it changes. . .  That started after I was hospitalized, when I started seeing things that weren't there. . . Yeah, I have driven.  I also have a driver's license, but I couldn't pass the driver's test.  I had someone renew them online for me in case I needed to drive, I guess, for an emergency."  R. 40.  When the ALJ asked how Plaintiff could have a driver's license if she could not pass the test, she responded that "they don't do a vision screening online."  R. 40.

Given the extended colloquy about Plaintiff having a driver's license and the ALJ's citation of the reports from medical providers that Plaintiff could drive, the ALJ's failure to discuss her testimony and properly discredit in this case was error.  Therefore, the ALJ's decision was not based on substantial evidence.

**CONCLUSION**

Accordingly, the Court **REVERSES** and **REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 31, 2012.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

-15-